**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION**

| | |
|---|---|
| Audra Smith, Individually, and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>South Carolina State University,<br><br>Defendant. | C/A  5:22-cv-00567-SAL-PJG<br><br>**CLASS ACTION COMPLAINT**<br>(Jury Trial Demanded) |

**NATURE OF ACTION**

1. The law, as it pertains, to education and athletics at colleges and universities, subject to certain exceptions, provides:

> **No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]**

20 U.S.C. § 1681(a).

2. Defendant discriminates and has discriminated against women including the Plaintiff in the terms and conditions of education, athletics, and employment because of their sex.

3. Defendant fails and has failed to provide Plaintiff, Coach Audra Smith, with the personnel and resources necessary to properly run the women's Basketball program and has subjected her to a hostile environment and retaliation.

4. This has not only hurt the Plaintiff but has also hurt the student-athletes in her program.

5. Coach Smith is not an anomaly. Defendant is mistreating female athletes and coaches of women's teams systematically.

6. Defendant has provided inconsistent, disorganized, and misleading information to regulators and oversight bodies about.

7. Defendant governs itself in a way that flagrantly disregards the purpose and spirit of Title IX.

8. Plaintiff brings these individual and class claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq., and the regulations and policies promulgated pursuant to that law and the Equal Pay Act.

9. Plaintiff asks this Court and a jury of her peers to intercede and remedy sexism at the Defendant not only to benefit her, but also to remedy the wrongs endured by all similarly situated women athletes and coaches in women's sports are who being harmed by sexism at S.C. State University.

## PARTIES, JURISDICTION, AND VENUE

10. Plaintiff, Audra Smith, is a citizen and resident of Orangeburg County South Carolina.

11. Plaintiff is a female couch of women's basketball at the Defendant University.

12. Plaintiff files this action individually for all damages and on behalf of a class of all other similarly situated females for injunctive and declaratory relief only.

13. Defendant, South Carolina State University, is a Public University located in Orangeburg County, South Carolina.

14. The parties have sufficient connections to Orangeburg County and the Orangeburg Division and the acts and omissions giving rise to this lawsuit occurred here.

15. This Court has personal jurisdiction over the parties and this is a proper venue.

16. This Court has subject matter jurisdiction over these claims. 20 U.S.C. § 1708.

## THE REQUIREMENTS OF TITLE IX

17. Title IX says: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

18. The Civil Rights Restoration Act of 1987 made plain Congress' intent that the terms "program or activity," as used in Title IX, mean any program or activity so long as any part of the public institution receives federal financial assistance. 20 U.S.C. §1687.

19. Thus, Defendant is subject to Title IX even if none of the funding for either its men's or women's athletic program comes from federal sources, if it otherwise receives federal assistance.

20. Applying Title IX to intercollegiate athletics, The Federal Office of Civil Rights (OCR) has adopted regulations requiring educational institutions receiving federal funds to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

21. The regulations, codified at 34 C.F.R. Part 106 are enforced by OCR.

22. 34 C.F.R. § 106.41(c) specifies ten (10) non-exclusive factors that may be considered in the determination of equal athletic opportunity:

    a. Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

    b. The provision of equipment and supplies;

    c. Scheduling of games and practice time;

    d. Travel and per diem allowance;

3

  e. Opportunity to receive coaching and academic tutoring;

  f. Assignment and compensation of coaches and tutors;

  g. Provision of locker rooms, practice and competitive facilities;

  h. Provision of medical and training services;

  i. Provision of housing and dining facilities and services; and

  j. Publicity.

Other factors to be considered are a school's "failure to provide necessary funds for teams for one sex" and recruiting.

  23. In 1979, OCR issued a policy interpretation of Title IX and the Regulations as applied to intercollegiate athletics at 44 Fed. Reg. 71,413 (Dec. 11, 1979).

  24. The OCR Policy Interpretation sets forth three areas of compliance under Title IX as it relates to college sports: (1) equal accommodation of student interests and abilities; (2) equal athletic financial assistance; and (3) equal treatment and benefits.

  25. According to the Policy Interpretation, compliance in the area of the first prong of equal athletic participation opportunities is determined under the following three-part test:

  a. whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments;

  b. where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

    c. where the members of one sex are under-represented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

See 44 Fed. Reg. 71,418.

26. This three-part test was further clarified after notice and comment in OCR's 1996 Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (the "1996 OCR Clarification"), making clear that "participation opportunities must be real, not illusory."

27. The Regulations require that sponsors of intercollegiate athletics (such as Defendant) take such remedial actions as are necessary to overcome the effects of sex discrimination in violation of Title IX. See 34 C.F.R. §106.3(a).

28. The Regulations also require that federal fund recipients like Defendant adopt nondiscrimination policies and grievance procedures, appoint and train Title IX officers to receive and investigate sex discrimination complaints, and disseminate this information to all students, faculty, and employees. 34 C.F.R. §§106.8 & 106.9.

29. The Regulations further require that recipients promise and confirm compliance by filing an Assurance of Compliance with the Federal Department of Education each time they apply for or receive federal financial assistance. 34 C.F.R. §106.4.

30. The Regulations further require that sponsors of interscholastic athletics comply with the athletics regulations within three years of their effective date (which was July 21, 1975).

31.     Section 106.51(a)(3) states: "A recipient shall not enter into any contractual or other relationship which directly or indirectly has the effect of subjecting employees or students to discrimination."

32.     Title IX's prohibition of discrimination on the basis of sex covers, among other things: compensation, job assignments, fringe benefits, and any other term, condition, or privilege of employment. 34 C.F.R. §106.51(b). Title IX prohibits sex discrimination in employment based upon the sex of the employee and based upon the sex of the students taught or athletes coached.

## SEX-BASED DISPARATIES

33.     The Regulations, as set forth above, require that sponsors of interscholastic athletics comply with the athletics regulations within three years of their effective date (which was July 21, 1975).

34.     Now, more than 40 years later, Defendant still does not fully comply with Title IX.

35.     Defendant has not taken any recent remedial actions to satisfy its obligations under Title IX.

36.     Nor has Defendant provided females with an equal opportunity to participate in varsity athletics or provided equal treatment and benefits to its female athletes, and any remedial actions which Defendant has taken in the past years have been insufficient to satisfy Defendant's obligations under Title IX.

37.     As set forth above, a school's provision of equal treatment and benefits to those with participation opportunities is assessed based on an overall comparison of the male and female student athletic programs and the student body as a whole.

38. Defendant has unlawfully discriminated against female student athletes in violation of Title IX with respect to athletic treatment and benefits in many areas which are outlined in more detail below.

39. The information summarized in the chart and paragraphs below was submitted by Defendant to the federal government.

| Year | Female Student Athletes | Male Student Athletes | % of Females | Female Aid Awarded | Male Aid Awarded | % of Aid Awarded to Females | Amount of Aid SC State deprived female student Athletes |
|---|---|---|---|---|---|---|---|
| 2017-2018 | 122 | 180 | 40% | $ 901,116.00 | $ 1,666,725.00 | 35% | $ 136,223.74 |
| 2018-2019 | 143 | 219 | 40% | $ 934,359.00 | $ 1,820,959.00 | 34% | $ 154,067.72 |
| 2019-2020 | 106 | 169 | 39% | $ 951,667.00 | $ 1,670,562.00 | 36% | $ 59,083.09 |

40. Defendant has not asserted or attempted to demonstrate any justification for SC State's failure to provide female student-athletes with equal athletic financial aid that does not reflect underlying discrimination—and Plaintiff is not aware of any.

41. Defendant provided the below to the federal government regarding recruiting:

|  | Number of Student Athletes | | Recruiting Expenses | |
|---|---|---|---|---|
| Year | Female | Male | Women's Teams | Men's Teams |
| **2017-2018** | 122 | 180 | $ 4,997.00 | - |
| **2018-2019** | 143 | 219 | $20,945.00 | $42,281.00 |
| **2019-2020** | 106 | 169 | $20,911.00 | $27,434.00 |

(CONTINUED NEXT PAGE)

7

42. Defendant provided the below to the federal government regarding coaching salaries:

|  | Number of Head Coaches | | Head Coach Salary (Averaged) | | Annual Salary per FTE Head Coach | |
|---|---|---|---|---|---|---|
| **Year** | **Men** | **W** | **Men's** | **Women's** | **Men's** | **Women's** |
| **2017-2018** | 4 | 6 | $ 233,183.00 | $ 56,464.00 | $ 310,911.00 | $ 67,757.00 |
| **2018-2019** | 4 | 6 | $ 137,125.00 | $ 61,067.00 | $ 182,833.00 | $ 73,280.00 |
| **2019-2020** | 4 | 6 | $ 124,888.00 | $ 53,131.00 | $ 166,517.00 | $ 63,757.00 |

|  | Number of Asst. Coaches | | Annual Salary per FTE Asst. Coach | |
|---|---|---|---|---|
| **Year** | **Men** | **Women** | **Men's** | **Women's** |
| **2017-2018** | 3 | 8 | $ 44,591.00 | $ 36,868.00 |
| **2018-2019** | 15 | 9 | $ 41,362.00 | $ 24,801.00 |
| **2019-2020** | 13 | 7 | $ 47,517.00 | $ 32,771.00 |

43. Looking specifically at Defendant's basketball program, Defendant provided the below to the federal government:

|  | Participation | | Operating expenses per participant | | Total Operating Expenses | | |
|---|---|---|---|---|---|---|---|
| **Year** | **M** | **W** | **Men's** | **Women's** | **Men's** | **Women's** | **Total** |
| **2017-2018** | 17 | 11 | $11,688.00 | $12,300.00 | $198,700 | $135,298 | $333,998 |
| **2018-2019** | 18 | 17 | $13,608.00 | $10,034.00 | $244,941 | $170,584 | $415,525 |
| **2019-2020** | 18 | 15 | $11,410.00 | $11,357.00 | $205,378 | $170,359 | $375,737 |

|  | Total Head Coaches | | Total Asst Coaches | |
|---|---|---|---|---|
| **Year** | **Men** | **Women** | **Men** | **Women** |
| **2017-2018** | 1 | 1 | 2 | 2 |
| **2018-2019** | 1 | 1 | 4 | 3 |
| **2019-2020** | 1 | 1 | 4 | 3 |

8

|          | Revenue       |              | Expenses      |              |
|----------|---------------|--------------|---------------|--------------|
| Year     | Men           | Women        | Men           | Women        |
| 2017-2018 | $720,318.00  | $778,927.00  | $720,318.00   | $778,927.00  |
| 2018-2019 | $785,619.00  | $697,329.00  | $785,619.00   | $697,329.00  |
| 2019-2020 | $ 847,152.00 | $736,523.00  | $737,913.00   | $739,162.00  |

### PLAINTIFF'S TENURE AT DEFENDANT

44. Defendant hired Plaintiff to serve as the head coach for the women's basketball team beginning to 2018-2019 academic year.

45. Plaintiff had over twenty-five years of experience coaching basketball at the college level – fourteen as a head coach – prior to starting with Defendant.

46. Defendant provided Plaintiff with a five-year contract that provided for a salary of $135,000. The contract also outlines an annual salary pool of $124,000 for assistant coaches.

47. Plaintiff has performed her job duties for Defendant in a competent if not more than competent manner throughout her employment.

48. Defendant provided the following information through the NCAA Membership Financial Reporting System the 2019 reporting year:

   a. The men's basketball team had 18 participants while the women's basketball team had 17 participants.

   b. The coaching salary, benefits, and bonuses paid to the men's head basketball coach was $184,5000 while the coaching salary, benefits, and bonuses paid to the women's head basketball coach was $155,000.

49. Defendant provided the following information through the NCAA Membership Financial Reporting System the 2020 reporting year:

9

    a. The men's basketball team had 19 participants while the women's basketball team had 18 participants.

    b. The coaching salary, benefits, and bonuses paid to the men's head basketball coach was $193,809 while the coaching salary, benefits, and bonuses paid to the women's head basketball coach was $188,603.

50. In March 2021, Defendant named Tony Madlock as the new head coach for the Men's Basketball team. At the time Madlock was hired, he had only served as a head coach for one season. Defendant provided Madlock with a five-year contract that provided for a salary of $180,000 with an annual potential bonus of $19,000. The contract also outlines an annual salary pool of not less than $145,776 for assistant coaches and a budget of $976,550 for the men's basketball program to include the assistant coaches' salary pool.

51. On average, Defendant's Athletic Department employs head coaches for male programs at an average salary of $124,888 and employs head coaches for female programs at an average salary of $53,131.

52. On average, Defendant's Athletic Department employs assistant coaches for male programs at an average salary of $43,862 and employs assistant coaches for female programs at an average salary of $23,408.

53. Madlock and his assistant coaches have been provided nicer facilities and offices in comparison to those provided to the women's basketball team.

54. In September 2021, Plaintiff had two assistant coaches, but had money remaining in the assistant coaches' salary pool budgeted for the Women's basketball team and was permitted to have three assistant coaches. Plaintiff found an alumnus who was willing to coach part-time for a salary within the remaining salary pool.

55. Defendant's athletic director, Stacy Danley, prevented Plaintiff from hiring the additional coach.

56. Danley also made statements that he was going to make a lot of changes. Danley has suggested that one coach is over budget and that being over budget is a terminable offense.

57. Plaintiff had available foundation funds to correct any alleged over-budget expenses.

58. For the 2021-2022 academic year, the men's basketball team has the below coaching staff:



59. For the 2021-2022 academic year, the women's basketball team has the below coaching staff.



60. Defendant has also denied Plaintiff sufficient academic support which made it more difficult to effectively coach her players given her reduced coaching staff and adversely impacted her athletes was provided to the men's program.

61. Defendant has taken numerous actions to prevent Plaintiff from using her budget in a manner to successfully perform her job duties and coach her players.

62. Defendant has failed to inform Plaintiff of several budget funds, such as the budget for apparel, until a significant portion of the academic year had passed. This created arbitrary challenges to Plaintiff's job.

63. Defendant created obstacles which made it difficult for Plaintiff to utilize her budget to purchase necessary athletic equipment.

64. While both the men's and women's basketball team have been provided similar travel budgets, the women's team has been subjected to reduced communication in comparison to male program.

65. A lack of communication when compared to the male program has resulted in last minute timeliness issues forcing the women's team to forgo flights in lieu of busses on two long-distance road trips.

66. Defendant has provided both the men's and women's basketball team with locker rooms.

67. However, Defendant allows visiting men's teams to use the women's locker room. Visiting women's teams are not provided with this opportunity in the inverse.

68. This practice limits the access female players have to their locker room.

69. Defendant has not provided the women's basketball team with as much publicity as is provided to the men's teams, specifically, Defendant's football team.

70. On or about October 20, 2021, Counsel for Plaintiff submitted a FOIA request to Defendant requesting information related to the funding of Defendant sports teams.

71. On or about November 8, 2021, Counsel for Plaintiff again reached out to Defendant to express concerns that Defendant was not treating Plaintiff fairly or allowing her to use her budget in the manner they should.

72. On January 4, 2022, Plaintiff filed a state court lawsuit against Defendant alleging a failure to properly respond to the FOIA request.

73. The FOIA request plainly delved into matters that showed the above Title IX disparities.

74. On February 19, 2022, prior to the start of a women's basketball game, Plaintiff was told that two parents were on the floor-level of the Court when they were not supposed to be.

75. The parents were on the floor to see their daughter honored on a senior night.

76. Gameday management is not one of Plaintiff's job duties and it was not Plaintiff's responsibility to ask the parents to move from the Court.

77. Plaintiff was issued a pretextual three-day suspension based on this relatively minor issue.

78. Plaintiff was suspended because Defendant believed she was raising concerns about Title IX violations based on her FOIA request and lawsuit.

## CLASS ACTION ALLEGATIONS

79. Plaintiff brings this action, individually and on behalf of all other similarly situated coaches of female teams and athletes that have been subjected to Defendant's willful violations of Title IX.

80. The class is sufficiently numerous that joinder of all members is impracticable.

81. Plaintiff will fairly and adequately protect the interests of the class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of other class members. Plaintiff is

represented by experienced counsel who can appropriately represent this class and who have handled actions of similar types as this.

82. Plaintiff's claims are typical of the class members' claims and derive from a common nucleus of operative facts from the Defendants employment practices which deprive Plaintiffs and class members of wages earned and as such Plaintiffs and class members have compensable damages for the claims which are typical to all.

**FOR A FIRST CAUSE OF ACTION**
(Violation of Title IX – Discrimination in Employment)

83. Plaintiff realleges the foregoing where consistent.

84. Defendant discriminated against Plaintiff because she is the coach of a women's basketball team and because she is female.

85. As a result of Defendant's actions, Plaintiff has experienced anxiety, depression, and other psychological and physical manifestations of such distress.

86. As a result of Defendant's actions, Plaintiff has been and will be damaged in the form of lost compensation and benefits, lost professional status and reputation, lost resources for her to do her job similar to those provided to coaches of men's sports, and loss of future employment opportunities. Such discrimination has caused and will cause Plaintiff pain, humiliation, emotional distress, and other damages.

87. Plaintiff seeks an injunction to prevent the continued discriminatory treatment. She seeks continued employment as a head basketball coach at Defendant, but without discrimination in the terms and conditions of her employment, including pay and benefits, and the financial and personnel resources necessary to fully and properly perform her job, develop her skills and career, and operate her teams at the Division I level.

**FOR A SECOND CAUSE OF ACTION**
(Violation of Title IX – Equal Pay)

88. Plaintiff realleges the foregoing where consistent.

89. Plaintiff is a female who has been employed by Defendant since 2018.

90. Plaintiff performed work requiring substantially equal skill, effort, and responsibility under similar working conditions as Coach Madlock and all other male head coaches.

91. Plaintiff was paid less than Coach Madlock and other male coaches performing substantially the same work under similar circumstances.

92. As a result of Defendant's actions, Plaintiff has been damaged in the form of lost employment, lost compensation and benefits, lost professional status and reputation, and will be damaged by loss of future employment opportunities. Such discrimination has caused Plaintiff pain, humiliation, emotional distress including anxiety, depression, and other psychological and physical manifestations of such distress, and other damages.

**FOR A THIRD CAUSE OF ACTION**
(Title IX Retaliation)

93. Plaintiff realleges the foregoing where consistent.

94. Plaintiff engaged in protected activity when she made complaints to Defendant about unequal treatment of her player compared to the treatment of the men's basketball team including but not limited to complaints that the men's team was able to use their apparel budget without issue.

95. Plaintiff further engaged in protected activity when she submitted a FOIA request to Defendant requesting information related to the funding of Defendant sports teams.

96. Defendant suspended Plaintiff for pretextual reasons in retaliation for this protected activity.

97. The actions taken against the Plaintiff and the actions which have resulted in her disparate treatment and damages are the result of the planned and concerted effort to retaliate against the Plaintiff for the charges she filed against the Defendants for harassment and discrimination.

98. Defendants are liable to the Plaintiff for the willful, wrongful, and bad faith retaliation against the Plaintiff for protected actions she took opposing unfair and egregious harassment. Plaintiff is entitled to an award of actual damages as well as reasonable attorney's fees and for the cost of this action.

**FOR A FOURTH CAUSE OF ACTION**
(Violation of the Equal Pay Act)

99. Plaintiff realleges the foregoing where consistent.

100. Plaintiff is paid less for equal work (requiring equal skill, effort, and responsibility) than similarly situated males including Madlock.

101. Defendant does not have a seniority, merit, or quality/quantity system of compensation.

102. The disparate pay discussed herein was not made on factors other than sex.

103. The disparate pay described herein violates the equal pay act.

104. The Defendant is liable to the Plaintiff for the willful violation of the Equal Pay Act alleged herein and damages caused thereby including, but not limited to, the amount of underpayment for the three years before the date the lawsuit is filed through the date of the verdict and an additional equal amount as liquidated damages. Plaintiff also requests pre-judgment interest

and attorney's fees and costs of this action. Plaintiff last requests equitable relief including a correction to the underpayment at issue.

## PRAYER FOR RELIEF

WHEREFORE, for the actions alleged above, Plaintiff prays for judgment to be awarded against the Defendant SC State for all recoverable damages she has suffered as a result of the as alleged herein in an appropriate amount to be determined by a jury; as well as any restitution or equitable action this Court should deem proper. Plaintiff is further entitled to Attorney's Fees and Costs in accord with State and Federal Law. Plaintiff also requests injunctive relief to be deemed just and proper. Last, Plaintiff requests pre- and post-judgment interest be awarded on all of her damages.

**CROMER BABB PORTER & HICKS, LLC**

BY:   s/*Samantha E. Albrecht*
J. Paul Porter (#11504)
Samantha E. Albrecht (#12546)
1418 Laurel Street, Suite A (29201)
Post Office Box 11675
Columbia, South Carolina 29211
Phone  803-799-9530
*Attorneys for Plaintiff*

February 23, 2022
Columbia, South Carolina